This Opinion is a
Precedent of the TTAB

Mailed: March 11, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*Shannon DeVivo*
*v.*
*Celeste Ortiz*

————

Opposition No. 91242863

————

Mary Ann Novak of Hilgers Graben PLLC,
for Shannon DeVivo.

Wendy Peterson of Not Just Patents LLC,
for Celeste Ortiz.

————

Before Zervas, Kuczma and Hudis,
Administrative Trademark Judges.

Opinion by Zervas, Administrative Trademark Judge:

Celeste Ortiz ("Applicant") filed an application on November 18, 2017 to register

the standard character mark ENGIRLNEER on the Principal Register based on an

allegation of a bona fide intention to use the mark in commerce pursuant to Section

1(b) of the Trademark Act, 15 U.S.C. §1051(b), for the following goods:

> Cups; coffee cups, tea cups and mugs in International Class
> 21;
>
> Lanyards for holding badges; Lanyards for holding keys in
> International Class 22; and

Hoodies; Shirts; Sweatshirts in International Class 25.[1]

Shannon DeVivo ("Opposer") asserts in her amended Notice of Opposition[2] that since at least October 23, 2017, she has continuously used the mark ENGIRLNEER in connection with:

> (a) providing information services, including interactive online information services, to young women and girls seeking careers in the fields of science, technology, engineering, and math (collectively "STEM");
>
> (b) providing a website featuring educational information in STEM fields for young women and girls pursuing a career in these fields; and
>
> (c) providing online non-downloadable educational information in STEM fields.[3]

Opposer also asserts that since at least November 11, 2017, she has been continuously using the mark ENGIRLNEER in commerce in connection with books;[4] and that Applicant's mark is likely to be confused with Opposer's mark for Opposer's asserted services and goods pursuant to Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d).

Applicant, in her Answer (12 TTABVUE), denied the salient allegations in the amended Notice of Opposition and raised certain "affirmative defenses" that are mere

---

[1] Application Serial No. 87690220.

[2] The amended Notice of Opposition has numerous exhibits. Except as provided in Trademark Rule 2.122(d)(1), 37 C.F.R. § 2.122(d)(1) (involving copies of pleaded registrations showing current status and title), exhibits attached to notices of opposition are not evidence on behalf of the party submitting them. *See* Trademark Rule 2.122(c), 37 C.F.R. § 2.122(c); TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) §§ 317 and 704.05 (2019). The exhibits attached to the amended Notice of Opposition are therefore not part of the evidentiary record.

[3] Amended Notice of Opposition ¶ 4, 6 TTABVUE 3.

[4] *Id*. at ¶ 6, 6 TTABVUE 4.

amplifications of Applicant's denials, and which we do not consider as separate affirmative defenses.

On April 19, 2019 the parties submitted a "(Proposed) Agreement for Accelerated Case Resolution" ("ACR") to resolve this case by the ACR procedure (14 TTABVUE), which the Board approved on May 3, 2019 (16 TTABVUE). *See* TBMP §§ 528.05(a)(2), 702.04 and 705. The Agreement allows each party to file evidence with its brief.

## I.    The Record

In addition to the pleadings, the record automatically includes the involved application file pursuant to Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1). Opposer submitted her (i) "Testimonial Declaration" ("Opposer's Test. Decl.") with exhibits (18 TTABVUE); (ii) attorney's declaration ("Novak Decl.") with exhibits (19 TTABVUE); and (c) "Supplemental Testimonial Declaration" ("Opposer's Supp. Test. Decl.") with exhibits (21 TTABVUE). Applicant did not submit any evidence, but did submit a brief.

## II.    Applicant's Evidentiary Objections

Applicant objects to Opposer's Internet evidence, stating that "although admissible for what they show on their face, see Trademark Rule 2.122(e)(2), 37 C.F.R. § 2.122(e)(2), this evidence also constitutes hearsay and may not be relied upon for the truth of the matters asserted therein."[5] Applicant's objection is not well taken because the evidence is not used to establish the truth of any assertion contained therein, but rather what this evidence shows on its face. Fed. R. Evid. 801.

---

[5] Applicant's brief at p. 12, 20 TTABVUE 13.

Applicant also argues that "opposer attempts to authenticate and attribute pages to applicant without any admissions in the record from applicant as to the content or authenticity of these pages being applicant's" and "objects to these pages being admissible as submitted except for the value of rebutting any lack of bona fide intent that opposer mentioned in its [sic] Notice."[6] Applicant's objection is overruled because (i) Applicant did not identify the pages that are the subject of her objection; (ii) Applicant has not denied that the website engirlneer.org is Applicant's website as Opposer states in her Testimony Declaration (¶ 55); and (iii) the webpages submitted with Opposer's Testimony Declaration contain the date of access and their source in accordance with Trademark Rule 2.122(e), 37 C.F.R. § 2.122(e) and *Safer, Inc. v. OMS Inves., Inc.*, 94 USPQ2d 1031 (TTAB 2010). Further, we note that one of the documents to which Applicant objects was produced to Opposer by Applicant.[7]

## III. Standing

A threshold issue in every inter partes case is the plaintiff's standing to challenge registration. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014); *John W. Carson Found. v. Toilets.com Inc.*, 94 USPQ2d 1942, 1945 (TTAB 2010). Section 13 of the Trademark Act permits an opposition by "[a]ny person who believes that he would be damaged by the registration of a mark upon the principal register …." 15 U.S.C. § 1063. To establish her standing, Opposer must demonstrate that she possesses a "real interest" in this

---

[6] *Id*. at p. 11, 20 TTABVUE 12.

[7] Opposer's Test. Decl. ¶ 57, 18 TTABVUE 14.

proceeding beyond that of a mere intermeddler, and a "reasonable basis" for her belief of damage. "A 'real interest' is a 'direct and personal stake' in the outcome of the proceeding." *Exec. Coach Builders, Inc. v. SPV Coach Co.*, 123 USPQ2d 1175, 1179 (TTAB 2017) (quoting *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1026 (Fed. Cir. 1999)). "A claim of likelihood of confusion that 'is not wholly without merit,' including prior use of a confusingly similar mark, may be sufficient 'to establish a reasonable basis for a belief that one is damaged.'" *Id.* (quoting *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982)).

As discussed below, Opposer has demonstrated that she has been using the same mark ENGIRLNEER for various goods and services prior to the filing date of Applicant's application. In addition, Opposer has demonstrated that she is the owner of subsisting application Serial Nos. 87863365 (" '365 application") and 88060899[8] (" '899 application") for goods and services in International Classes 16, 35 and 41, both for the mark ENGIRLNEER; and that on September 7, 2018 in the '365 application, and on May 23, 2019 in the '899 application, the assigned Examining Attorneys suspended action on Opposer's applications because they "may be refused registration under Section 2(d) because of a likelihood of confusion" should Applicant's mark register.[9]

In light of the foregoing, we find that Opposer has shown a real interest in this proceeding and a reasonable basis for her belief of damage from registration of

---

[8] *Id.* at ¶¶ 43-52, Exhs. 12-26, 18 TTABVUE 12-13, 162-347.

[9] *Id.* at ¶¶ 47 and 52, Exhs. 21 and 26, 18 TTABVUE 11-12, 299-301, 344-346.

Applicant's mark, and thus has standing. *See Empresa Cubana Del Tabaco*, 111 USPQ2d at 1062; *Weatherford/Lamb Inc. v. C&J Energy Servs. Inc.*, 96 USPQ2d 1834, 1837 (TTAB 2010) (standing established by submission of USPTO Office Action suspending pleaded application pending the possible refusal to registration based on an alleged likelihood of confusion). We are not persuaded by Applicant's argument that Opposer has not established standing because of alleged deficiencies in (i) the Examining Attorneys' Office Actions; and (ii) Opposer's declaration supporting her submissions of USPTO Office Actions and responses in both the '365 and '899 applications. Whether there are deficiencies is irrelevant; what matters is that Opposer's pleaded applications have been suspended in view of Applicant's application.

## IV. Priority

Section 2(d) of the Trademark Act permits an opposer to file an opposition on the basis of ownership of "a mark or trade name previously used in the United States … and not abandoned." To establish priority, the mark must be distinctive, inherently or otherwise, and Opposer must show proprietary rights in a mark as to which Applicant's mark gives rise to a likelihood of confusion. *Otto Roth & Co. v. Universal Foods Corp.*, 640 F.2d 1317, 209 USPQ 40, 43-45 (CCPA 1981). These proprietary rights may arise from a prior registration, prior trademark or service mark use, prior use as a trade name, prior use analogous to trademark or service mark use, or any other use sufficient to establish proprietary rights. *Herbko Int'l Inc. v. Kappa Books Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1378 (Fed. Cir. 2002). "[T]he decision as to priority is made in accordance with the preponderance of the evidence." *Hydro-*

*Dynamics, Inc. v. George Putnam & Co., Inc.*, 811 F.2d 1470, 1 USPQ2d 1772, 1773 (Fed. Cir. 1987); *see also Embarcadero Techs., Inc. v. RStudio, Inc.*, 105 USPQ2d 1825, 1834 (TTAB 2013). ("[O]pposer must prove by a preponderance of the evidence that its common law rights were acquired before any date upon which applicant may rely.").

Opposer relies on a distinctive common law trademark and service mark, ENGIRLNEER.[10] As Opposer states in her declaration, it is a coined term and has no meaning in Opposer's field of work.[11] Through the word "girl" and the similarity of the entire term to the word "engineer," it suggests a female engineer.

Opposer's acquisition of common law rights to the term ENGIRLNEER must precede Applicant's actual or constructive use of her mark. *See Larami Corp. v. Talk to Me Programs Inc.*, 36 USPQ2d 1840, 1845 (TTAB 1995) (parties may rely on constructive use filing dates for purposes of priority); *Zirco Corp. v. Am. Tel. & Tel. Co.*, 21 USPQ2d 1542, 1543-45 (TTAB 1991) (constructive use in Section 7(c) of the Trademark Act, 15, U.S.C. §1057(c), establishes nationwide priority rights from the filing date of the application). In other words, it is Opposer's burden to demonstrate that she owns a trademark or service mark that was used prior to Applicant's first use or constructive use of her mark. *Syngenta Crop Prot. Inc. v. Bio-Chek LLC*, 90

---

[10] Opposer has not pleaded use analogous to trademark use and Applicant has made clear that use analogous to trademark use is not an issue in this proceeding. Applicant correctly states, "[r]emember that opposer did not plead any analogous use – **actual use in commerce** is a requirement." (emphasis in original.) Applicant's brief at p. 19, 20 TTABVUE 20. *Central Garden & Pet Co. v. Doskocil Mfg. Co.*, 108 USPQ2d 1134, 1142 (TTAB 2013) (reliance on priority through analogous use must be pleaded).

[11] Opposer's Test. Decl. ¶ 6, 18 TTABVUE 5.

USPQ2d 1112, 1119 (TTAB 2009) ("applicant may rely without further proof upon the filing date of its application as a 'constructive use' date for purposes of priority."). Oral testimony, if sufficiently probative, is normally satisfactory to establish priority of use, *Powermatics, Inc. v. Globe Roofing Prods. Co.*, 341 F.2d 127, 144 USPQ 430, 432 (CCPA 1965), and the testimony of a single witness may be adequate to establish priority. *See Exec. Coach Builders*, 123 USPQ2d at 1184. Thus, Opposer must establish first use of a distinctive mark prior to the filing date of Applicant's application, November 18, 2017, which is Applicant's constructive priority date and the earliest date upon which Applicant may rely.

### a. Service Mark Use

Turning first to Opposer's services, Section 45 of the Trademark Act, 15 U.S.C. § 1127, defines a "service mark" as "any word, name, symbol, or device, or any combination thereof — (1) used by a person ... to identify and distinguish the services of one person ... from the services of others and to indicate the source of the services, even if that source is unknown." According to the Federal Circuit "[t]he Lanham Act … does not define 'services,' nor does the legislative history provide such a definition. However, our predecessor court stated that the term 'services' was intended to have broad scope, reasoning that 'no attempt was made to define 'services' simply because of the plethora of services that the human mind is capable of conceiving.'" *In re Advertising & Mktg. Dev., Inc.*, 821 F.2d 614, 2 USPQ2d 2010, 2013 (Fed. Cir. 1987) (quoting *Am. Int'l Reinsurance Co. v. Airco, Inc.*, 570 F.2d 941, 197 USPQ 69, 71 (CCPA 1978)). The Board has required that the services be "performed as a regular

or recurring activity associated with the mark." *Giersch v. Scripps Networks, Inc.*, 90 USPQ2d 1020, 1023 (TTAB 2009).

Opposer states in her Testimonial Declaration that she is a Professional Environmental Engineer (¶ 2); that she coined the term ENGIRLNEER in the first part of 2017 (¶ 6); that she registered engirlneer.com as a domain name in approximately June 2017 (¶ 7); that she started publishing information on her www.engirlneer.com website in September 2017 (¶ 13); that the ENGIRLNEER mark is prominently featured in large lettering centered on the top of every page of her website (¶ 10); and that since the launch of the www.engirlneer.com website and her first book, she has been a regular speaker at events for school-aged children, where she promotes ENGIRLNEER books, informational services and her website (¶ 41).[12]

In addition, Opposer states that by October 15, 2017, she was using on her website the ENGIRLNEER mark to introduce users to a series of young fictional female characters with interests in STEM related areas designed to inform young women and girls about various STEM fields, how those fields apply to real-world problems, and possible careers in those fields; and that the website identified possible careers for those interested in working with animals (¶ 15). Further, she states that by October 30, 2017, her website contained the full cast of fictional characters introducing girls to STEM careers and teaching them about real-world problems in a

---

[12] *Id.*, 18 TTABVUE 4-6, 11.

variety of STEM-related areas, including chemistry, geology, biology and animals, traffic safety, and water supply (¶ 17).[13]

By November 11, 2017, Opposer had added information to her website (including a downloadable book featuring the fictional characters that introduces girls to phosphates and how they enter ponds and streams) (¶¶ 19, 24).[14] By clicking on the picture of the book's cover, users were able to freely download a full copy of the book (¶ 24).[15] Opposer first started selling her books on amazon.com in January 2018, which is after the filing date of Applicant's application.[16]

In order to prove her priority, Opposer submitted the following "true and correct cop[ies] of [her] website as they appeared to users of the website" on various dates before Applicant filed her intent-to-use application:[17]

---

[13] *Id.*, 18 TTABVUE 6-7.

[14] *Id.*, 18 TTABVUE 7-8.

[15] *Id.*, 18 TTABVUE 8.

[16] Opposer has authored and markets the following books on her website; "The Engirlneers Save Fish Pond," "The Engirlneers Build Duck Bridge," "The Engirlneers Save the Wild Cats," "The Engirlneers Protect the Ground Water," and "The Engirlneers Market the Speed Bump" (¶¶24, 29). *Id.*, 18 TTABVUE 8-9.

[17] *Id.* at ¶¶ 15-19, Exh. 7, 18 TTABVUE 6-7, 119-126. Applicant argues that the webpages Opposer relies on are not self-authenticating pages because they are from WordPress (with the word "Edit" at the bottom of each page) and are not the published Internet pages. Opposer states in her declaration, however, that the webpages are true and correct copies of webpages that were available on the Internet prior to the filing date of Applicant's application and that they "show the substance of the pages of my www.engirlneer.com website as they were published, used in commerce, and available to anyone with an Internet connection on the respective listed dates in October and November 2017." Opposer's Supp. Test. Decl. ¶ 2, 21 TTABVUE 26-27. We therefore have considered this evidence.

ENGIRLNEER    BLOG
STORIES       SHOP



ENGIRLNEERS ▾

# ABOUT ENGIRLNEER

The Engirlneers were the vision of a Professional Engineer with a passion for encouraging women of all ages to pursue careers in science, technology, engineering, and math (STEM). As a woman in a male-dominated industry, I understand how vital it is to get more diversity in these fields. While the number of women entering these degree programs has increased, the number of women who graduate with degrees in these fields or maintain a life-long career in these fields remains low compared to men. It's important for young girls to learn what a career in a STEM field is like, especially how fun it can be. There are hundreds of careers in STEM fields, ranging from those that only require certifications to those that require a Ph.D. If you love english or writing, you can be a technical writer. If you love communicating with people, you can go into business development or marketing. If you love the technical side of one of these careers, you can become an engineer or a data scientist. If you love working with your hands, you can go into a trade, such as an electrician or plumber. The important thing to remember is that these careers are vital to our lives everyday, and the world needs the innovation and creativity that women can bring to the table.

Edit



RLNEER STORIES | BLOG SHOP | ENGIRLNEERS ▾

# ELAN

Elan

Hau. My name is Elan! I've been fascinated by water supply systems ever since my reservation's water supply was changed from groundwater to the nearby river. The state environmental quality department told us that our groundwater was dangerous. Chemicals from industries upgradient of our wells made it into the water. Cleanup was going to be expensive, so we installed a small water treatment plant along the river. My class toured the plant when it was built, and it was amazing how many components go into the design of a water treatment facility. One day, I want to be an environmental engineer and help less fortunate communities get safe water to drink.

Edit

Another "true and correct copy" of a webpage from Opposer's website with the

heading "Betty" states,

> Hello! I'm Betty. I love animals. My parents and I foster pets through the local animal shelter, and we also take care of wildlife that have been hurt and need some attention before we release them back to their home. I really love fish and sea animals, one day, I hope to be [a] vet that works for a non-profit organization, saving wildlife from the dangers of climate change and unsustainable practices.[18]

---

[18] Opposer's Test. Decl. at Exh. 4, 18 TTABVUE 86.

In addition, Opposer states that the following is a "true and correct" copy of the webpage from which users have downloaded her book, as the webpage appeared to users of the website on November 11, 2017 (¶ 24):[19]





After clicking on the link, consumers were directed to Opposer's "The Engirlneers Save Fish Pond" book, which had the following first two pages:[20]

---

[19] *Id.* at Exh. 8, 18 TTABVUE 126.

[20] *Id.* at Exh. 10, 18 TTABVUE 132-33.



Learn how to become an



at

www.engirlneer.com

The last page of the book is depicted below:[21]



The wording surrounding the term ENGIRLNEER forming a "seal design" is "Teamwork · Creativity · Hard Work · Design · Innovation." Opposer states that this book was available for download on her website on November 11, 2017 (¶25).[22]

The book contains the following passages:[23]

> "Ladies! I figured out what is wrong with the pond! It's just as I expected, the water has really high phosphates!" Chloe stated.
>
> "What are phosphates?" asks Sally. "And why did it turn our pond green?"

---

[21] *Id.* at Exh 10, 18 TTABVUE 158.

[22] *Id.*, 18 TTABVUE 8.

[23] *Id.*, 18 TTABVUE 146-150.

"Phosphates are nutrients. They supply plants with food, just like the plant food you have in your hands, Sally," Chloe informs them.

"What?" Sally asks, dropping the plant food to the ground.

"Don't worry Sally, that food does not contain phosphates, I made sure of it."

"Chloe, where do these phosphates come from?" asks Tatiana.

"Phosphates come from fertilizers that farmers put on their fields."

"Not all of the fertilizers are absorbed by the plants. When it rains, the fertilizer washes off into surface water, such as ponds, streams, and rivers. This fertilizer then acts as food for other plants, such as algae, which is what the green slime growing in the pond was."

Applicant argues that the brief character descriptions are not directly linked to "providing educational information" or "providing career information"; and that students who are mature enough to make career choices would not be interested in children's books.[24] Applicant has offered no evidence to support her arguments and the arguments appear to be speculation.

We find that Opposer's maintenance of, and updates to, her webpages with the character descriptions (such as for Elan and Betty), the downloadable book, and the assertions in Opposer's Testimonial Declaration establish that Opposer used her mark in connection with the services asserted in the amended Notice of Opposition, and were a regular or recurring activity associated with the ENGIRLNEER mark, prior to November 18, 2017 (the filing date of Applicant's application). At a minimum,

---

[24] Applicant's brief at p. 14, 20 TTABVUE 15.

(i) the "About Engirlneer" webpages inform readers that the STEM field is male-dominated, that the number of women entering STEM degree programs has increased, and that there are many job options for women in the STEM field; (ii) the webpage featuring "Elan" informs readers that water supply can be from groundwater to river water, that groundwater can be dangerous due to chemicals from industries flowing into water, that cleanup of water can be expensive and that water is treated in a water treatment facility; (iii) the webpage featuring "Betty" informs readers that fostering pets is possible through the local animal shelter and that wildlife may be rehabilitated and released back to their homes, and teaches that veterinarians may work for non-profit organizations and that such organizations are engaged in saving wildlife from the dangers of climate change and unsustainable practices; and (iv) the "Engirlneers Save Fish Pond" book informs readers that phosphates are nutrients that supply plants with food and may turn a pond green with algae, and phosphates come from fertilizers that farmers put on fields and may wash off into surface waters.[25] This information constitutes educational information in STEM fields for young women and girls pursuing a career in these fields, and non-downloadable educational information in STEM fields.

We further find that Opposer's website is interactive. "Interactive" is defined in the online version of MERRIAM-WEBSTER DICTIONARY (last accessed on October 14, 2019 at https://www.merriam-webster.com/dictionary/interactive) as "involving the

---

[25] Opposer's Test. Decl. Exhs. 4-10, 18 TTABVUE 826-158.

actions or input of a user."[26] The website is interactive because, according to the unrebutted testimony of Opposer, one may click on the picture of the book and access the book.[27]

### b. Trademark Use

Turning to the downloadable book, Opposer does not claim that the title of the book is a mark. *See In re Cooper*, 254 F.2d 611, 117 USPQ 396, 398 (CCPA 1958) ("the title of a book cannot be registered as a trademark"). She claims, "[o]n the front cover of the book — separate and apart from its title — Opposer's ENGIRLNEER mark prominently appears as a source-identifier for the book. Additionally, Opposer's ENGIRLNEER mark also appears on the back cover of the book."[28] Opposer explains,

> the ENGIRLNEER mark is prominently featured as a source identifier in at least three places on the book. First, Opposer included the ENGIRLNEER mark on the front cover of the book, separate and apart from the book's title. The mark is displayed prominently as a source identifier in the bottom right corner of the front cover, where there is no other text and where there is an "empty" space in the cover's illustrated art. Second, Opposer's mark appears in large blue lettering on the second page of the book. Third, Opposer's mark appears by itself on the otherwise blank back cover of the book.[29]

---

[26] The Board may take judicial notice of dictionary definitions, *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), including online dictionaries that exist in printed format or regular fixed editions. *In re Red Bull GmbH*, 78 USPQ2d 1375, 1377 (TTAB 2006). We take judicial notice of the definition of "interactive."

[27] Opposer's Test. Decl. ¶ 24, 18 TTABVUE 8 ("By clicking on the picture of the book's cover, users were able to freely download a full copy of the book.").

[28] Amended Not. of Opp. ¶7, 6 TTABVUE 4.

[29] Opposer's main brief at p. 17, 17 TTABVUE 22. *See also* Opposer's declaration which states, "[a]s can be seen from Exhibit 10, the book features my ENGIRLNEER mark on the front cover, separate and apart from the book's title. The ENGIRLNEER mark as displayed on the book serves as a source-identifier for the book." Opposer's Test. Decl. ¶ 26, 18 TTABVUE 8.

Applicant argues that the seal design with the term ENGIRLNEER cannot function as a trademark because it is a laudatory self-approval seal, is "masquerading as a third-party seal of approval."[30] The wording in the seal surrounding ENGIRLNEER suggests the qualities of a woman in the engineer profession. There is nothing in the seal suggesting it is a third-party seal of approval.

Although the book does not directly refer to any of the characters as "engirlneers," the title makes clear that the characters of the book, Tatiana, Chloe and Sally, are "engirlneers." One of Opposer's webpages on the website where the book was accessed reinforces this association through its inclusion of the heading "The Engirlneers" above a depiction of Chloe and Sally, and other fictional characters:[31]

---

[30] Applicant's brief at p. 21, 20 TTABVUE 22.

[31] Opposer's Test. Decl. Exh. 6, 18 TTABVUE 107. The webpage was included on Opposer's website prior to the filing date of Applicant's application.



Thus, the term ENGIRLNEER (i) is incorporated in the seal design found on the front and back pages of the book; (ii) is part of the title of the book; and (iii) identifies one or more fictional characters featured in the book.[32]

---

[32] The second page of the book invites a reader to become an "engirlneer" and provides a web address where more information can be obtained on how to become an "engirlneer." *Id.* at Exh. 10, 18 TTABVUE 133. Based on the evidence of record, readers will consider the fictitious characters as "engirlneers" despite the fact that the book offers readers information on how they too can become "engirlneers."

Section 45 of the Trademark Act, 15 U.S.C. § 1127, provides that a trademark "includes any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." "A trademark informs the public of a source of the goods and assures them of its quality." *In re Polar Music Int'l AB*, 714 F.2d 1567, 221 USPQ 315, 317 (Fed. Cir. 1983) (citing *Coca-Cola Co. v. Koke Co. of Am.*, 254 U.S. 143, 146 (1920) and *Saalfield Publ'g Co. v. G & C Merriam Co.*, 238 F. 1, 8 (6th Cir. 1917)). "[N]ot all words, devices, symbols and the like necessarily function as trademarks notwithstanding that they may have been adopted with the intent of doing so." *In re Illinois Bronze Powder & Paint Co.*, 188 USPQ 459, 462 (TTAB 1975); *see also In re Water Gremlin Co.*, 635 F.2d 841, 208 USPQ 89, 90 (CCPA 1980) ("Appellant's asserted intention to adopt the package design to indicate source may well be true, but intent or lack of intent at the time of adoption of a particular design is not controlling."). Rather, to be protected as a valid mark, a designation must create "a separate and distinct commercial impression, which thereby performs the trademark function of identifying the source of the goods to the customers." *In re Chemical Dynamics, Inc.*, 839 F.2d 1569, 5 USPQ2d 1828, 1829-30 (Fed. Cir. 1988).

Multiple trademarks may be associated with a book, such as the name of the author, *see In re First Draft, Inc.*, 76 USPQ2d 1183 (TTAB 2005), the title of the book if in a series, *see In re Cooper*, 254 F.2d 611, 117 USPQ 396 (CCPA 1958),[33] a portion

---

[33] The *In re Cooper* court found the title of a single book not to be a trademark because titles of books are considered to be nothing more than the name by which the book may be identified in much the same way that other items of merchandise are identified. The court opined:

of the title of a book, *see In re Scholastic Inc.*, 23 USPQ2d 1774 (TTAB 1992), ("*Scholastic II*"), a fictitious character in a book, *see In re Caserta*, 46 USPQ2d 1088 (TTAB 1998), and the publisher of the book, *see Educ. Dev. Corp. v. Educ. Dimensions Corp.*, 183 USPQ 492, 495 (TTAB 1974).

For ENGIRLNEER in the seal design to function as a source indicator for books, it must not function merely as part of the title of the book or the name of a character in the book. This is because a "title of a book [as a single work] … does not perform a trademark function. That is, it does not identify the source of the book, but serves merely to identify the material found therein, i.e., the work of the author. In so doing it is nothing more than a descriptive designation therefor." *In re Scholastic Inc.*, 223 USPQ 431, 431 (TTAB 1984) ("*Scholastic I*"). *See also Herbko Int'l, Inc. v. Kappa Books, Inc.*, 64 USPQ2d at 1378; *In re Cooper*, 117 USPQ at 398.[34] In addition, the name of a fictitious character appearing in a portion of a title and in the text of a book may not function as a trademark if it is not used in the manner of a trademark to identify the goods and distinguish them from those of others. *In re Caserta*, 46 USPQ2d at 1089 (addressing the name of a fictitious character FURR-BALL FURCANIA appearing only as part of the title and in the text of comic strips and

> [H]owever arbitrary, novel or non-descriptive of contents the name of a book its title may be, it nevertheless describes the book. Appellant has nowhere attempted to answer the question, How else would you describe it? What else would you call it? If the name or title of a book were not available as a description of it, an effort to denote the book would sound like the playing of the game "Twenty Questions."

*In re Cooper*, 117 USPQ at 400.

[34] Opposer published a single work prior to Applicant's priority date.

comic magazines); *see also Scholastic I*, 223 USPQ 431 (TTAB 1984) (THE LITTLES, as used in the title of each book, would be viewed as identifying the main character in the book and not as a trademark for books).

There are parallels between the instant case and *In re Polar Music Int'l*, 221 USPQ at 318, where the Federal Circuit considered the trademark ABBA owned by the popular music group ABBA for sound recordings. The court examined a label affixed to a phonograph record, a record album cover, and a point of purchase display as used in record stores and found that ABBA could function independently of the music group as a source indicator for sound recordings and "not just an identification of the singers." *Id*. The court focused on what the mark for sound recordings represented, finding, "[p]honograph records and tapes are much more than 'pieces of plastic.' They are the embodiment of sound. People purchase sound recordings because of the sounds they contain; it is sound that gives a recording its uniqueness. The quality of a sound recording encompasses both the quality of the sounds themselves and the quality of the material on which the sounds are recorded." *Id*. The court concluded, "[t]he public has come to expect and associate a certain quality, not just of sounds but of how the sounds are produced on the record and the physical qualities of the record itself, with the mark 'ABBA.'" *Id*.

Similarly, a publisher's mark such as the term ENGIRLNEER located within the seal design may serve as more than just the source identifier for a physical good, a children's book. It also may serve to inform the public that the subject matter of the book is of a certain quality and suitability. If in printed form, it may also identify the quality of the physical product. *See id*. at 317 ("A trademark informs the public of a

source of the goods and assures them of its quality."). It does so just as an author's name may function as a source indicator. As stated in *In re First Draft*, 76 USPQ2d at 1189, "[w]hen the name is found to serve not merely as the designation of the writer of each of the works, but also is used in such a manner as to assure the public that the works are of a certain quality and the name therefore serves as an indicator of the source of the writings, it serves the function of a mark."

Thus, even though ENGIRLNEERS appears in the title of the book and is the group name for the characters in the book, the positioning of the term distant from the title of the book, its inclusion within a design, its prominent size, its appearance on the second page in conjunction with an invitation to the reader to "learn how to become an engirlneer," and its appearance on the last page of the book, results in a separate and distinct commercial impression which performs the trademark function of identifying the source of Applicant's book to consumers. *See Scholastic II*, 23 USPQ2d at 1779 ("even if THE MAGIC SCHOOL BUS were the complete title of one of the books in the series, or identified a character in the books, these factors would be insufficient to overcome the evidence in this case that THE MAGIC SCHOOL BUS also functions as a trademark."). Opposer's evidence therefore suffices to demonstrate that Opposer used her ENGIRLNEER mark on a downloadable children's book prior to November 18, 2017.

Applicant raised several additional challenges to Opposer's testimony and evidence pertaining to priority, none of which have any merit. We address them in turn below.

● Applicant maintains we should not conclude that the public would be aware of Opposer's webpages because Opposer's website was published on the Internet. Opposer states, however, in her declaration that her book was "downloaded by users from the www.engirlneer.com website starting on November 11, 2017,"[35] and:

> 40. When my website first launched, and before Applicant's filing date of November 18, 2017, I immediately started to reach out to friends and colleagues within the engineering community, as well as those who are not engineers, to promote my website and book. …
>
> 41. Since the launch of the www.engirlneer.com website and my first book, I have become a regular speaker at events for school-aged children, primarily targeted to third through sixth graders, though sometimes including middle school and high school students. … At these events, I routinely hand out postcards, small notebooks, or other items bearing the ENGIRLNEER mark and promoting the ENGIRLNEER books, informational services, and website.[36]

The evidence reflects that prior to November 18, 2018, Opposer promoted her book and website, and her book was downloaded by users from her website. We therefore do not agree with Applicant that the public was unaware of Opposer's webpages.

● Applicant challenges Opposer's submissions because they are not supported by any third-party registration examples (presumably specimens used in those registrations) of what constitutes Opposer's services pertaining to educational and career information.[37] Applicant also references the assigned Examining Attorney's refusal to accept one of Opposer's specimens submitted in connection with one of

---

[35] Opposer's Test. Decl. ¶ 25, 18 TTABVUE 8.

[36] *Id.* at ¶¶ 40-41, 18 TTABVUE 11.

[37] Applicant's brief at p. 13, 20 TTABVUE 14.

Opposer's applications (Application Serial No. 88060899 for the mark ENGIRLNEER).[38] First, we are not bound by the decisions of examining attorneys in other applications. *See In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1635 (Fed. Cir. 2016) (the USPTO must "examine all trademark applications for compliance with each and every eligibility requirement" regardless of the prior treatment of applications involving similar marks); *In re Nett Designs Inc.,* 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001) ("Even if some prior registrations had some characteristics similar to [applicant's] application, the PTO's allowance of such prior registrations does not bind the Board or this court."); *In re USA Warriors Ice Hockey Program, Inc.*, 122 USPQ2d 1790, 1793 n.10 (TTAB 2017) ("Neither the Board nor any Trademark Examining Attorney is bound by decisions of Examining Attorneys to register prior marks."). Second, we do not require such information here to make our determination on priority, because we do not rely only on webpages that are identical to or highly similar to those webpages submitted by Opposer as the specimen with her application.

● Applicant argues that, after averring particular dates of first use and first use in commerce in this proceeding, Opposer subsequently amended the '365 application to reflect the same dates. This circumstance does not persuade us that Opposer's first use dates asserted in this proceeding are false.[39]

---

[38] *Id.*; Opposer's Exhs. 23 (USTR record for application Serial No. 88060899) and 24 (November 19, 2018 Office Action), 18 TTABVUE 320-334.

[39] Opposer's Test. Decl. Exh. 20a (July 30, 2018 Resp.), 18 TTABVUE 260-64.

● With regard to Opposer's website evidence and her claimed use on books, Applicant argues that "for a downloadable book to act as a good, the specimen must show a method to download, purchase, or order the book"; and that "[t]here must be an offer to accept orders or instructions on how to place an order."[40] Applicant appears to be referring to the requirements set forth in the TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 904.03(e) (October 2018) entitled "Specimens for Trademarks Identifying Computer Programs, Movies, and Videos, or Audio Recordings." It states, "[f]or downloadable computer software, an applicant may submit a specimen that shows use of the mark on an Internet website. Such a specimen is acceptable only if it creates an association between the mark and software and provides sufficient information to enable the user to download or purchase the software from the website. If the website simply advertises the software without providing a way to download, purchase, or order it, the specimen is unacceptable." (citations omitted). We are not persuaded by Applicant's argument. First, the evidence reflects that Opposer's book was freely downloadable through her website by clicking on the image of the book.[41] Second, Applicant's reference to specimen requirements in examination is misplaced. We have sufficient evidence in

---

[40] Applicant's brief at p. 15, 20 TTABVUE 16.

[41] Opposer's Test. Decl. ¶ 24, 18 TTABVUE 8 ("the www.engirlneer.com website contained a page headed 'Engirlneer Stories,' which depicted an image of the cover of my first book, 'The Engirlneers Save Fish Pond,' with an embedded link. By clicking on the picture of the book's cover, users were able to freely download a full copy of the book. Exhibit 8 is a true and correct copy of the [Wordpress] page of my website from which users downloaded the book, as it appeared to users of the website on November 11, 2017 ….").

the record to establish trademark use for priority purposes in connection with downloadable books.[42]

● Applicant argues, "Opposer's alleged use in commerce on her website does not allege bona fide transactions for books or information," citing *Times Mirror Magazines, Inc. v. Sutcliffe*, 205 USPQ 656, 662-63 (TTAB 1979) (to qualify as a "bona fide" transaction for purposes of establishing priority, "the initial shipment should not be contrived or fabricated but rather it should be open and notorious and made as a part of a commercial or related transaction directed to customers or potential customers for such goods with the purpose of establishing goodwill, recognition and association of the mark for the goods originating exclusively with the shipper").[43] To the extent that Applicant means bona fide monetary transactions, Section 2(d) does not require monetary "transactions." It precludes the registration of a mark when the mark "[c]onsists of or comprises a mark which so resembles … a mark … previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." The term "mark" includes any trademark or service mark,

---

[42] Applicant adds that "[w]hether a specimen qualifies as a display associated with the goods or services under [the] Lanham Act is a factual question." Applicant's brief at p. 12, 20 TTABVUE 13. She also points out that the Examining Attorney refused to accept Opposer's specimens in one of her applications as supporting services identified as "providing a website featuring educational information in the academic fields of engineering, science, technology, math, namely, for the purpose of academic study for young women and girls pursuing a career in these fields; providing online non-downloadable educational information in the academic fields of engineering, science, technology, and math for the purpose of academic study" in International Class 41. The issue before us is Opposer's priority and not whether a webpage qualifies as a specimen of use for the registration of a mark.

[43] *Id*. at p. 27, 20 TTABVUE 28.

and a service mark includes a word "used by a person … to identify and distinguish the services of one person … from the services of others and to indicate the source of the services, even if that source is unknown" and a trademark includes any word "used by a person … to identify and distinguish his or her goods … from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." Trademark Act § 45, 15 U.S.C. § 1127. The statute does not require that goods or services be sold for purposes of establishing priority. *See Am. Express Mktg. & Dev. Corp. v. Gilad Dev. Corp.*, 94 USPQ2d 1294, 1298 n.3 (TTAB 2010) ("… use of marks in conjunction with the rendering of free services still constitutes a 'use in commerce' under the Trademark Act. In other words, a for-profit sale is not required."); *Capital Speakers Inc. v. Capital Speakers Club of Washington D.C. Inc.*, 41 USPQ2d 1030, 1034 n.3 (TTAB 1996) ("A for-profit sale is not required."). In any event, priority can be shown for marks for goods given away as promotional items, *see Tiberghien Freres S.A. v. Miguel Gil, S.A.*, 185 USPQ 183, 184 (TTAB 1974) (furnishing free trademarked bathing suits worn publicly by contestants in beauty contest was sufficient to establish priority), *McDonald's Corp. v. McKinley*, 13 USPQ2d 1895, 1898 n.6 (TTAB 1989) (finding that goods need not be sold "in order to come within the ambit of the statute"), and for goods given away as part of educational outreach efforts.

### c. Determination on Priority

In view of the foregoing, we find that Opposer has established priority of use for the mark ENGIRLNEER in connection with: (a) providing information services, including interactive online information services, to elementary, middle and high

school girls seeking careers in STEM fields, and their parents and mentors; (b) providing a website featuring educational information in STEM fields for elementary, middle and high school girls pursuing a career in these fields, and their parents and mentors; (c) providing online non-downloadable educational information for elementary, middle and high school girls in STEM fields, and their parents and mentors; and (d) a downloadable children's book.[44]

## V.    Likelihood of confusion

Our determination of Opposer's claim of likelihood of confusion is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*"); *see also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In considering the evidence of record on these factors, two key considerations are the similarities between the marks and the similarities between the goods or services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods [or services] and differences in the marks."). We make that determination on a case-by-case basis, *On-Line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 56 USPQ2d 1471, 1474 (Fed. Cir. 2000), aided by the application of the factors set out in *DuPont,* and we consider each *DuPont* factor

---

[44] See Opposer's Test. Decl. ¶¶ 20 and 41, 18 TTABVUE 7 and 11, referring to third through sixth graders, middle school and high school students, and their parents and mentors as consumers of Opposer's goods and services.

for which there is evidence and argument. *See In re Guild Mortg. Co.,* 912 F.3d 1376, 129 USPQ2d 1160, 1162 (Fed. Cir. 2019); *In re Country Oven, Inc.,* 2019 USPQ2d 443903, *2 (TTAB 2019).

It is Opposer's burden to establish a likelihood of confusion claim by a preponderance of the evidence. *Cerveceria Centroamericana S.A. v. Cerveceria India Inc.,* 892 F.2d 1021, 13 USPQ2d 1307, 1309 (Fed. Cir. 1989).

### a. Similarity of the Marks

The first *DuPont* factor we consider concerns the similarities or dissimilarities of the marks in appearance, sound, connotation and commercial impression. *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005).

Of course, Opposer's common law mark is identical to Applicant's mark in all respects. Applicant seeks registration of a standard character mark; as such, its display is not limited to any particular font style, size or color. *See In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909-10 (Fed. Cir. 2012); *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1259 (Fed. Cir. 2011); *In re Aquitaine Wine USA, LLC*, 126 USPQ2d 1181, 1186 (TTAB 2018) (literal elements of standard character marks may be presented in any font style, size or color). We therefore must consider that the parties' marks may be displayed in the same or similar font style, size or color.

The *DuPont* factor regarding the similarity of the marks heavily favors a finding of likelihood of confusion.

### b. Similarity of Goods/Services

It is not necessary that the parties' respective goods and services be competitive, or even that they move in the same channels of trade to support a holding of likelihood of confusion. It is sufficient that the respective goods and services are related in some manner, or that the conditions and activities surrounding the marketing of the goods and services are such that they would or could be encountered by the same persons under circumstances that could give rise to the mistaken belief that they originate from the same source. *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012) (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007); *see also On-line Careline Inc. v. Am. Online Inc.*, 56 USPQ2d at 1475-76; *In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289, 1290 (Fed. Cir. 1984). Moreover, because the marks are identical, the degree of similarity between the goods or services required for confusion to be likely declines. *See Orange Bang, Inc. v. Olé Mexican Foods, Inc.*, 116 USPQ2d 1102, 1117 (TTAB 2015).

It is sufficient for a finding on likelihood of confusion that relatedness is established for any item encompassed by the identification of goods in the application. *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981); *Apple Comput. v. TVNET.Net, Inc.*, 90 USPQ2d 1393, 1398 (TTAB 2007).

Opposer submitted the following use-based, third-party registrations showing that the same mark has been registered for both Opposer's and Applicant's types of goods and services:[45]

| Registration No. | Mark | Goods/Services |
|---|---|---|
| 5124535 | PETER RABBIT | Downloadable children's books and T-shirts |
| 5131952 | DR SEUSS | Children's books featuring children's stories, shirts and sweatshirts |
| 5538997 | RABBITMITTEN | Children's books and shirts |
| 3945957 | THE VERY HUNGRY CATERPILLAR | Children's books, shirts and sweatshirts |
| 5546119 | HELLO my city is | Children's books and coffee cups, tea cups and mugs; cups and mugs |
| 4804614 | DANIEL TIGER'S NEIGHBORHOOD | Children's activity books, T-shirts and sweatshirts |
| 3895589 | FLOAT LIKE A BUTTER-FLY, STING LIKE A BEE | Children's books, shirts and sweatshirts |
| 5373128 | GIRL POWER GO BE STRONG. BE SMART. BE AMAZING! | Children's books, shirts and sweatshirts |
| 4781868 | BUZZ ALDRIN | Children's books and shirts; providing information in the fields of science and space exploration; providing a website featuring information, news and news archives in the fields of science and space exploration |
| 5110219 | I DON'T WANT TO BE A PRINCESS | Children's books; hooded sweatshirts, sweatshirts and T-shirts; providing a website featuring information in the fields of education and entertainment for children |
| 5246861 | GOLDIE BLOX and Design | Children's books, sweatshirts, shirts and online journals, namely, blogs in the fields of entertainment, education, engineering, math, science and construction |
| 5036899 | PEG + CAT | Printed matter, namely, books and magazines for children featuring humor and entertainment and cups |
| 5751749 | HARRY POTTER AND THE CURSED CHILD | Fictional books, beverage glassware, namely mugs and lanyards for holding badges and keys |

---

[45] Novak Decl., 19 TTABVUE 3-417.

| Registration No. | Mark | Goods/Services |
|---|---|---|
| 3793617 | DINOSAURS UNEARTHED | Children's books, t-shirts and Educational services, namely, conducting classes, seminars, conferences and workshops in the field of paleontology, dinosaurs, fossils, skeletons, prehistoric mammals and reptiles; Educational services, namely, providing a website featuring educational information in the fields of paleontology, dinosaurs, fossils, skeletons, prehistoric mammals and reptiles; Production and distribution of motion pictures |
| 4706832 | LESBIANS WHO TECH | Graphic shirts and providing educational services, namely, conducting classes, workshops and seminars in the field of technology; providing education services namely, conducting classes, workshops and seminars in the field of diversity in the technology industry |
| 4872612 | BEING HUMAN and Design | Shirts and sweatshirts; educational services, namely, conducting classes, seminars, conferences, workshops, and public presentations in the field of science and philosophy and distribution of printed materials in connection therewith in hard copy or electronic format on the same topics; providing a website featuring educational information in the academic field of science and philosophy for the purpose of academic study |
| 5318037 | S.T.E.A.M. NERDS | Shirts and Education services, namely, providing live and on-line workshops, seminars, and presentations in the field of science, technology, engineering, art, and math |
| 4345358 | WNE and Design | Sweatshirts, shirts and providing career information in the field of business, engineering, science, pharmacology, and information technology |
| 5096102 | JIJI | Shirts, sweatshirts, and educational services, namely, providing continuing education courses, classes, workshops, seminars, and non-downloadable webinars in the field of teaching mathematics to elementary, middle school and high school students |
| 5034799 | TOURO LAW TOURO COLLEGE JACOB D. | Cups, lanyards for holding ID tags, sweatshirts, T-shirts and career |

| Registration No. | Mark | Goods/Services |
|---|---|---|
| | FUSCHBERG LAW CENTER and Design | counseling, namely, providing advice concerning education options to pursue career opportunities |
| 5598898 | UTAH STATE | Mugs and cups, sweatshirts, T-shirts, shirts, and providing a website featuring information regarding school admissions, academic and research programs … and publications |
| 5271953 | XHARAMARA | Shirts and providing information in the field of children's education |

While not evidence of use of the marks therein, third-party registrations may serve to suggest that the parties' goods and services are of a type which may emanate from a single source. *See Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002) (evidence that "a single company sells the goods and services of both parties, if presented, is relevant to a relatedness analysis"); *In re Mucky Duck Mustard Co.*, 6 USPQ2d 1467, 1467 n.6 (TTAB 1988); *In re Albert Trostel & Sons Co.*, 29 USPQ2d 1783, 1785-86 (TTAB 1993).[46]

Opposer also provided evidence of use of her mark on T-shirts, tank tops, sweatshirts, hoodies, coffee mugs, stickers, postcards, greeting cards and tote bags,

---

[46] Opposer also submitted lists of applications and registrations obtained from a search on the USPTO's TESS database. Pending applications are only evidence that an application has been filed on a certain date. *Nike Inc. v. WNBA Enters. LLC*, 85 USPQ2d 1187, 1193 n.8 (TTAB 2007); *Interpayment Servs. Ltd. v. Docters & Thiede*, 66 USPQ2d 1463, 1468 n.6 (TTAB 2003). With regard to the registrations on the lists, they have limited probative value because the full identifications of goods are not included. Further, we do not take judicial notice of application or registration files. *Beech Aircraft Corp. v. Lightning Aircraft Co.*, 1 USPQ2d 1290, 1293 (TTAB 1986) ("[T]he Board does not take judicial notice of application and registration files that reside in the Patent and Trademark Office.").

albeit after the filing date of Applicant's application.[47] Such goods tend to be collateral goods. *See L.C. Licensing, Inc. v. Berman*, 86 USPQ2d 1883, 1889 (TTAB 2008) ("It is common knowledge, and a fact of which we can take judicial notice, that the licensing of commercial trademarks on 'collateral products' has become a part of everyday life.").

In view of this evidence, we find that sweatshirts and shirts, cups and mugs, and lanyards for holding badges and keys, are all commercially related to books and the provision of educational and professional information in the STEM fields to, among others, elementary, middle and high school girls and their parents and mentors.

Thus, the *DuPont* factor regarding the goods and services favors a finding of likelihood of confusion for the goods in International Classes 21, 22 and 25.

### c. Similarity of Trade Channels and Classes of Purchasers

Opposer argues that because there are no trade channel restrictions of the goods as identified in the application, Applicant's goods and Opposer's goods and services are presumed to travel in the same channels of trade to the same class of purchasers. This is not entirely correct; that presumption is only valid if and to the extent the goods at issue are identical, or, at minimum, closely-related. *See, e.g., In re Viterra Inc.*, 101 USPQ2d at 1908 (identical goods); *Hewlett-Packard Co.*, 62 USPQ2d at 1005 (where "several of HP's registrations cover goods and services that are closely related to the broadly described services that Packard Press seeks to register under the

---

[47] Opposer's Test. Decl. ¶ 38, 18 TTABVUE 11. *See also* Exh. 16 to Opposer's Test. Decl., a copy of the www.redbubble.com webpages from which these items can be purchased. 18 TTABVUE 213-233.

PACKARD TECHNOLOGIES mark," court held that "absent restrictions in the application and registration, goods and services are presumed to travel in the same channels of trade to the same class of purchasers") (emphasis added). However, absent an explicit restriction in the application, the identified goods in the application must be presumed to move in all channels of trade that would be normal for such goods and to all usual prospective purchasers for goods of that type. *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981) (citing *Kalart Co., Inc. v. Camera-Mart, Inc.*, 258 F.2d 956, 119 USPQ 139 (CCPA 1958)); *see also Anheuser-Busch, LLC v. Innvopak Sys. Pty Ltd.*, 115 USPQ2d 1816, 1825-26 (TTAB 2015) ("And absent any explicit restriction in the application or registration, we must presume the parties' identified goods to travel through all normal channels of trade for goods of the type identified, and we must consider them to be offered and sold to all of the usual customers for such goods." (citing *Coach Servs.*, 101 USPQ2d at 1722; *In re Elbaum* at 640)). In this case, we may only presume that goods of the type identified in Applicant's identification of goods will travel in all usual channels of trade and to all usual customers for such goods.

As general consumer goods, we find that Applicant's identified goods are marketed to the general population. Opposer's goods and services are targeted to "women and girls seeking careers in STEM fields and to the parents, mentors, or others supporting such women and girls seeking careers in STEM fields."[48] Consumers of Opposer's goods and services and consumers of Applicant's identified goods may overlap insofar

---

[48] Opposer's Test. Decl. ¶¶ 4, 40, 18 TTABVUE 5, 11.

as they both are marketed to girls and young women in elementary, middle and high school who seek careers and information about STEM and STEM professions, and their parents and mentors.[49]

Opposer states in her declaration that her books are available on amazon.com; that she promoted her website and books to friends and colleagues within the engineering community, as well as through her professional ties;[50] and that she used and continues to use social media including Facebook and Twitter to promote her website, information services, and goods.[51] Opposer also states in her declaration that Applicant's goods are marketed on Facebook and Instagram and that Applicant's T-shirts can be purchased on myshopify.com.[52] That both parties sell online is not irrelevant, but neither is it particularly probative.[53]

---

[49] With regard to Opposer's books and services, Applicant disputes that those contemplating a career in the STEM field would consider children's books. Applicant's brief at p. 14, 20 TTABVUE 15 ("Common sense would also indicate that students who are mature enough to make the career choices to be 'seeking careers in the fields engineering, science, technology, and math' would no longer be interested in children's books."). Opposer's goods and services, however, are directed not only to children, but also to their parents and mentors.

[50] Opposer's Test. Decl. ¶ 28, 18 TTABVUE 9.

[51] *Id*. at ¶ 42, 18 TTABVUE 12.

[52] *Id*. at ¶ 57, 18 TTABVUE 14.

[53] *Compare On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 56 USPQ2d 1471, 1476 (Fed. Cir. 2000) ("Contrary to On-Line Careline's assertion, the two services at issue are offered through the same channel, *i.e.*, the Internet. Furthermore, the record shows that the two companies target similar consumers and **employ similar advertising** and marketing channels. Therefore, we conclude that substantial evidence supports the TTAB's finding on this issue.") (emphasis added) *with In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1087 (Fed. Cir. 2014) ("Advertising on the Internet is ubiquitous and proves little, if anything, about the likelihood that consumers will confuse similar marks used on such goods or services.") (internal quotations and citations omitted) and *M2 Software, Inc. v. M2 Commc'ns, Inc.*, 450 F.3d 1378, 1383, 78 USPQ2d 1944, 1948 (Fed. Cir. 2006) ("Although both parties operate websites, that fact, without more, is insufficient to overcome the vast weight of evidence establishing that no overlap exists.").

The evidence does not establish that Opposer's goods and services are offered in the same trade channels, but rather, at most, shows that the trade channels are somewhat related and that the classes of customers overlap, and this slightly favors finding a likelihood of confusion.[54]

### d. Conditions under Which and Buyers to Whom Sales Are Made

Opposer also argues that the *DuPont* factor regarding the conditions of sale favors a finding of likelihood of confusion. We agree. Opposer's online books are offered for retail sale for as low as $7.99.[55] Applicant's goods set forth in her identification are of a kind that are typically sold at low prices. Due to their low prices, we find them all to be subject to impulse purchasing made with a lesser standard of purchasing care. *See Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1899 (Fed. Cir. 2000) ("When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care."). With regard to Opposer's services, it appears from the webpages on which they are offered that they are offered without charge. Accordingly, the relatively inexpensive (or free) cost of the parties' goods and services favors finding a likelihood of confusion.

---

[54] Opposer also argues that the similarities between Opposer's and Applicant's websites and web addresses noted by Opposer (engirlneer.com and engirlneer.org) are evidence of similar trade channels. *See* Opposer's main brief at pp. 24-25, 17 TTABVUE 29-30. We do not think these superficial facts have any bearing on whether the trade channels are the same.

[55] Opposer's Test. Decl. Exh. 12, 18 TTABVUE 166.

### e. The Variety of Goods on Which a Mark Is or Is Not Used

The ninth *DuPont* factor takes into account the variety of goods on which a mark is or is not used. *DuPont,* 177 USPQ at 567. If a party in the position of plaintiff uses its mark on a wide variety of goods, then purchasers are more likely to view a defendant's related good under a similar mark as an extension of the plaintiff's line. *See, e.g.*, *In re Hitachi High-Technologies Corp.*, 109 USPQ2d 1769, 1774 (TTAB 2014) ("[C]onsumers who may be familiar with various products in the [Opposer's] product line, when confronted with applicant's mark, would be likely to view the goods marked therewith as additional products from [Opposer]. One of the circumstances mentioned in the ninth *du Pont* factor is the variety of goods on which a prior mark is used."). As mentioned above, Opposer stated that she has used her mark on children's books, T-shirts, tank tops, sweatshirts, hoodies, coffee mugs, stickers, postcards, greeting cards, tote bags and informational and educational services in the STEM fields.[56] Such uses are insufficient to persuade us that Opposer has used her mark on a variety of goods and that this *DuPont* factor favors a finding of likelihood of confusion. Opposer has provided only minimal information about sales of such goods sold under the ENGIRLNEER mark. We therefore find the ninth *DuPont* factor to be neutral with respect to a finding of likelihood of confusion.

### f. The Right to Exclude Others

In the few precedential Board cases discussing the eleventh *DuPont* factor, (the extent to which applicant has the right to exclude others from use of its mark on its

---

[56] Opposer's Test. Decl. ¶ 38 and Exh. 16, 18 TTABVUE 11, 213-233.

goods), applicants have failed to show sufficient use of their marks to establish a right to exclude others from use of their marks on their goods. *See McDonald's Corp. v. McSweet LLC*, 112 USPQ2d 1268, 1284-85 (TTAB 2014) ("Applicant's sales figures and Applicant's advertising and promotional expenditures are not sufficient to establish an appreciable level of consumer recognition.") (citing *In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198, 1205 (TTAB 2009) (the mere assertion of common-law use of its mark for ten years is not sufficient)). This factor is neutral in our analysis because Opposer has not provided any significant information about the advertising and sales of her goods and services offered under the ENGIRLNEER mark.

### g. Other *DuPont* factors

The remainder of Opposer's arguments merits little discussion. Opposer argues that the sixth *DuPont* factor regarding the number and nature of similar marks in use on similar goods weighs in Opposer's favor.[57] Because there is no evidence of third-party use, this factor is neutral. The tenth *DuPont* factor argued by Opposer regarding the market interface between Opposer and Applicant – is also neutral.[58] There is no evidence that there has been any interface between the parties. Finally, with regard to the twelfth *DuPont* factor concerning the extent of potential confusion, Opposer argues that this factor weighs in its favor because the marks are identical, the goods and services are closely related, and they travel through the same channel of trade and are marketed in a very similar manner to the same groups of

---

[57] Opposer's main brief at pp. 26-27, 17 TTABVUE 31-32.

[58] *Id.* at p. 27, 17 TTABVUE 32.

consumers.[59] Because of the lack of evidence regarding trade channels of the parties' goods and services and the volume of sales of Opposer's goods, we find this factor to be neutral as well.

### h. Conclusion on Likelihood of Confusion

We have considered and balanced all of the evidence of record pertaining to Opposer's likelihood of confusion claim, as well as all of the arguments related thereto, including any evidence and arguments not specifically discussed in this opinion. We find the marks are identical, the parties' goods and services related, and the parties' goods are subject to a low standard of purchaser care (impulse purchasing). The channels of trade and classes of customers are related, but only slightly. In view of our findings on these factors, we hold under Section 2(d) that there is a likelihood of confusion between Applicant's ENGIRLNEER mark for her goods and Opposer's identical ENGIRLNEER mark for her goods and services for which Opposer has demonstrated priority of use.

**Decision:**  The opposition is sustained and registration of Applicant's mark is refused registration for the recited goods in each of International Classes 21, 22 and 25.

---

[59] *Id.*